**SOMERSET RURAL ELECTRIC COOPERATIVE INC., and Pennsylvania Rural Electric Association, Petitioners,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 8, 1997.

Decided June 5, 1997.

Reargument Denied July 31, 1997.

Robert F. Young, Harrisburg, for petitioners.

Patricia Krise Burket, Assistant Counsel, Harrisburg, for respondent.

Janet E. Arnold, Reading, for intervenor, PA Electric Company.

Before COLINS, President Judge, FRIEDMAN, J., and LORD, Senior Judge.

FRIEDMAN, Judge.

Somerset Rural Electric Cooperative, Inc. (Somerset) and the Pennsylvania Rural Electric Association (Association) appeal from an order of the Pennsylvania Public Utility Commission (PUC) granting the Exceptions filed by the Pennsylvania Electric Company (Penelec) and reversing the decision of an Administrative Law Judge (ALJ). The effect of the PUC's order is to permit Penelec to continue providing electric service to Custom Coals International (Custom Coals) under section 7355(d) of the Unincorporated Area Certified Territory Act of 1990 (Territory Act).[1]

---

1. Section 7355(d) of the Territory Act, 15 Pa.C.S. § 7355(d), provides as follows:

**(d) Electric-consuming facilities served by another retail electric supplier.**-Except as provided in subsection (c), no retail electric supplier shall furnish, make available, render or extend retail electric service to any electric-consuming facility to which the service is being lawfully furnished by another retail electric supplier on July 30, 1975, or to which retail electric service is lawfully commenced thereafter in accordance with this section by another retail electric supplier.

The following pertinent definitions appear in section 7352 of the Territory Act, 15 Pa.C.S. § 7352.

"**Electric-consuming facilities.**" Everything that utilizes electric energy from a central station source.

"**Retail electric service.**" Electric service furnished to a consumer for ultimate consumption....

On March 23, 1994, Somerset and the Association jointly filed a formal complaint against Penelec alleging that, under sections 7354(b) and 7355(b) of the Territory Act,[2] Somerset is the lawful retail electric supplier to Custom Coals because Custom Coals is a new electric-consuming facility and Somerset is the closest retail electric supplier. Thus, the PUC should direct Penelec to cease rendering electric service to Custom Coals. Penelec filed an answer with new matter claiming that Penelec is the lawful retail electric supplier under section 7355(d) of the Territory Law because, since 1973, Penelec has been continuously supplying retail electric service to the site where Custom Coals is located. The case was assigned to an ALJ, who held extensive hearings on the matter.[3]

Based on the evidence presented, the ALJ made findings of fact and concluded that Somerset was the lawful retail electric supplier to Custom Coals. Thus, the ALJ sustained the complaint. Penelec filed Exceptions to the ALJ's decision, and Somerset, together with the Association, filed Reply Exceptions.

In reviewing the ALJ's decision, the PUC noted an apparent contradiction in the ALJ's decision. While the ALJ found that Custom Coals is building, or is planning to build, various "new electric-consuming facilities" at its location,[4] the ALJ concluded that the Custom Coals complex constitutes a single "electric-consuming facility." (ALJ's Conclusion of Law, No. 5.) Agreeing that the Custom Coals complex constitutes a single "electric-consuming facility," the PUC decided that Penelec is the lawful retail electric supplier under section 7355(d) of the Territory Act because Penelec has continuously provided electric service to the site since 1973 through an existing substation that will continue to be used to supply electric service to the Custom Coals' complex. Thus, the PUC granted Penelec's Exceptions and reversed the ALJ's decision.

On appeal to this court,[5] Somerset and the Association contend that the PUC

---

"Retail electric supplier." Any person, exclusive of a municipal corporation, engaged in the furnishing of retail electric service. The term shall apply only to a retail electric supplier which is an electric cooperative corporation and to a retail electric supplier which is subject to the jurisdiction of the [PUC] for rates, terms and conditions for electric service and has a mutual boundary in an unincorporated area with an electric cooperative corporation.

2. Section 7354(b) of the Territory Act, 15 Pa.C.S. § 7354(b), provides as follows:

(b) **Establishment of boundaries.**-Except as otherwise provided in this section, the boundaries of the certified territory of each retail electric supplier in any unincorporated area are hereby set as a line or lines substantially equidistant between its existing distribution lines and the nearest existing distribution lines of any other retail electric supplier in every direction with the result that there is hereby certified to each retail electric supplier such unincorporated area which in its entirety is located substantially in closer proximity to one of its existing distribution lines than the nearest existing distribution line of any other retail electric supplier.

Section 7355(b) of the Territory Act, 15 Pa.C.S. § 7355(b), provides in pertinent part as follows:
(b) **Service to new electric-consuming facilities.**-Except as provided in subsections (c) and (e), any new electric-consuming facility located in an unincorporated area which has not as yet been included in a map issued by the [PUC] ... shall be furnished retail electric service by the retail electric supplier which has an existing distribution line in closer proximity to the electric-consuming facility than is the nearest existing distribution line of any other retail electric supplier.

3. On May 11, 1994, Custom Coals filed a petition to intervene. Because the petition was unopposed, the ALJ granted Custom Coals intervenor status.

4. The "new" electric-consuming facilities include: (1) a coal preparation plant; (2) two densifier structures; (3) a refuse thickener; (4) an ultra-fine raw coal thickener; (5) an ultra-fine clean coal thickener; (6) a plant refuse storage bin; (7) a screening and breaker station; (8) raw coal stacking tubes; (9) a truck dump hopper; (10) a thickener pump building; (11) a clean coal truck bin; (12) a sampling station; (13) a clean coal silo; and (14) three substations. (ALJ's Findings of Fact, Nos. 18–19.)

The pre-existing structures within the business complex include: (1) a scale/office building; (2) an AMD plant; (3) an office building; (4) a warehouse; (5) two clean coal silos; (6) a rail loadout; and (7) pumphouses. (ALJ's Finding of Fact, No. 20.)

5. This court's scope of review of an adjudication of the PUC is limited to determining whether any constitutional rights were violated, whether an

should have concluded that the Custom Coals complex is a "new electric-consuming facility" under section 7355(b) of the Territory Act. We agree.

■ Section 7352 of the Territory Act, 15 Pa.C.S. § 7352 (emphasis added), defines an "electric-consuming facility" as *"everything* that utilizes electric energy from a central station source." Given this broad statutory definition,[6] one could argue that each of the separate structures to be built by Custom Coals in its business complex is a new "electric-consuming facility."[7] However, *under the same definition, the various* pre-existing structures are also "electric-consuming facilities." Moreover, the Custom Coals business complex, taken as an interdependent whole, (ALJ's Finding of Fact, No. 21), is also an "electric-consuming facility."

Like the PUC and the ALJ, we believe that the best approach here is to treat the entire Custom Coals business complex as a single "electric-consuming facility." Otherwise, integrated industrial sites, like the one here, could have multiple retail electric service suppliers providing retail electric ser-

vice. This would defeat the purposes of the Territory Act, which are:

■ to encourage the orderly development of retail electric service in unincorporated areas, [2] to avoid wasteful duplication of distribution facilities, [3] to avoid unnecessary encumbering of the landscape of the Commonwealth, [4] to prevent the waste of materials and natural resources, [5] to minimize inconvenience, diminished efficiency and higher costs in serving the consumer and otherwise for the public inconvenience and necessity....

15 Pa.C.S. § 7353.

■ Having made this determination, we must next examine whether the single interdependent Custom Coals complex is a *new* "electric-consuming facility" governed by section 7355(b) of the Territory Act. Here, the PUC adopted the ALJ's finding that Custom Coals is constructing a *"new* coal cleaning/blending plant and related structures" on land which includes "the *former* Laurel Mine site."[8] (ALJ's Finding of Fact, No. 4.) (Emphasis added.) Based on that finding, the

error of law was committed, or whether the findings of fact are supported by substantial evidence. *Glade Park East Home Owners Association v. Pennsylvania Public Utility Commission,* 156 Pa.Cmwlth. 466, 628 A.2d 468 (1993).

6. In *Pennsylvania Rural Electric Association v. Pennsylvania Public Utility Commission,* 81 Pa. Cmwlth. 466, 473 A.2d 1134 (1984), we noted that the statutory definition of "electric-consuming facility" is ambiguous and overly broad. Thus, to determine whether a particular entity is an "electric-consuming facility" under the Territory Act, it is necessary to consider the spirit of the statute.

7. In *Glade Park,* an ALJ determined that each unit of a condominium complex is a separate "electric-consuming facility" under the Territory Act; none of the parties filed exceptions to that decision. However, the Home Owners Association filed a petition for interim emergency relief, which the PUC denied because the right to relief was not clear and because there would be no irreparable harm. We upheld the PUC's decision. This case is distinguishable in a number of ways. First, an integrated business complex is different from separate and individual condominium units. Second, unlike this case, none of the parties in *Glade Park* filed exceptions to the ALJ's initial decision. Third, *Glade Park* did *not* involve a retail electric supplier which has continu-

ously provided retail electric service to the condominium units since 1973.

In *United Electric Cooperative, Inc. v. Pennsylvania Public Utility Commission,* 130 Pa.Cmwlth. 359, 568 A.2d 306 (1990), this court determined that a garage and storage facility located on the opposite side of the highway from the property owner's home was a separate "electric-consuming facility." Again, the facts here are distinguishable. First, the residential situation differs from the integrated business complex here. Second, the highway clearly separates the garage and storage facility from the property owner's home; thus, the land is not contiguous. Third, the case does not involve a retail electric supplier which has continuously provided retail electric service to the garage and storage facility since 1973.

8. Custom Coals does not intend to operate the former Laurel Mine site as a deep mine. (ALJ's Finding of Fact, No. 6.) Indeed, Lisa Crutchfield, Vice Chairman of the PUC, noted:

The mine has been closed and sealed. The former cleaning plant was dismantled, and the site has been in a caretaker status for nearly a decade. It is preposterous that any party would not recognize that the extensive project undertaken by Custom Coals constitutes "new" electric-consuming facilities.

(Statement of Vice Chairman Lisa Crutchfield at 3; R.R. at 41a.)

PUC could not logically conclude that section 7355(d) of the Territory Act applies here. Because the PUC found that the planned Custom Coals facility is "new" and, thus, *different* from the "former" electric-consuming facility, we conclude, like the ALJ, that section 7355(b) of the Territory Act controls.

 Under *Pennsylvania Rural Electric Association v. Pennsylvania Public Utility Commission*, 81 Pa.Cmwlth. 466, 473 A.2d 1134 (1984), the lawful retail electric supplier to a new electric-consuming facility is the one whose distribution line is closer to the center of the complex. Here, Somerset's nearest existing distribution line is in closer proximity to the center of the Custom Coals complex than is the nearest existing distribution line of Penelec. (ALJ's Conclusion of Law, No. 7; R.R. at 91a.) Therefore, pursuant to section 7355(b) of the Territory Act, Somerset is the lawful retail electric supplier for the Custom Coals complex.[9]

Accordingly, we reverse.

### ORDER

AND NOW, this 5th day of June, 1997, the order of the Pennsylvania Public Utility Commission, dated June 10, 1996, is reversed.

LEADBETTER, J., did not participate in the decision in this case.

9. We do not believe that Penelec is entitled to furnish retail electric service to the Custom Coals electric-consuming facility under section 7355(d) of the Territory Act. The PUC found that, since 1973, Penelec has continuously furnished retail electric service to "the Laurel Mine site" through an existing substation. (ALJ's Finding of Fact, No. 7.) However, because Penelec was providing retail electric service to the *former* Laurel Mine site, *not* to the *new* Custom Coals electric-consuming facility, Penelec does not have the right under section 7355(d) of the Territory Act to supply retail electric service to the Custom Coals complex.