643 A.2d 125

**WEST PENN POWER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 18, 1993.

Decided March 16, 1994.

Publication Ordered June 1, 1994.

John L. Munsch, for petitioner.

John Povilaitis, Donna Stanek Zehner and Frank B. Wilmarth for respondent.

Alan M. Seltzer for intervenor Metropolitan Edison Co.

Before McGINLEY and KELLEY, JJ., and NARICK, Senior Judge.

KELLEY, Judge.

Before the court is an appeal by West Penn Power Company (West Penn) from a decision of the Pennsylvania Public Utility Commission (PUC) dividing a disputed service territory between West Penn and Metropolitan Edison Company (Met–Ed).

In 1916 the Public Service Commission (PSC), the predecessor to the PUC, issued a certificate of public convenience to the Franklin Township Power & Light Company, the predecessor of Met–Ed, authorizing it to provide electric utility service to all of Franklin Township in Adams County. In 1927, the PSC issued a certificate of public convenience to the West Franklin Township Adams Electric Corporation, the predecessor of West Penn, authorizing it to provide electric utility service to a portion of Franklin Township, an area covered by the certificate previously issued to Met–Ed's predecessor. This portion of the township constitutes the disputed territory. There is no evidence of record that the PSC intended, by issuing the 1927 certificate, to revoke the certificate issued in 1916 to any degree, and there is no evidence of record that Met–Ed's predecessor participated in or was provided notice of the 1927 proceeding.[1]

Met–Ed has been providing service in the disputed territory since 1939 and, as of the date of the hearing below, Met–Ed has sixty customers in the disputed territory. Almost all of Met–Ed's customers are located on the eastern side of Route 234 and Newman Road.[2] Conversely, almost all of West Penn's customers in the disputed territory are on the western side of Route 234 and Newman Road.

In December of 1988, the developer of a residential development known as Mountain Top Estates applied to Met–Ed for electric service. Mountain Top Estates is located at the southwest corner of the intersection of Routes 30 and 234 and Newman Road. In February of 1989, West Penn advised Met–Ed that Mountain Top Estates was located within West Penn's territory and that West Penn would provide service.

In January of 1990, West Penn constructed electric distribution facilities, duplicating Met–Ed's existing facilities, in order to provide service to a residence and service station (Kimple

1. In 1927 Met–Ed's predecessor was Ortanna Electric Light & Power Company which had previously purchased Franklin Township Power & Light Company.

2. Route 234 runs north from Route 30. Newman Road runs south from approximately the same point on Route 30.

residence) which had to that date been served by Met–Ed. The Kimple residence is located on the eastern side of Route 234.

On March 6, 1990, Met–Ed filed a petition for declaratory order with the PUC requesting that the PUC resolve the boundary dispute. On March 26, 1990, West Penn filed an answer and new matter, a petition to intervene, and a motion asking that the PUC order Met–Ed to serve its petition to, among others, Met–Ed's customers in the disputed territory. On April 23, 1990, West Penn filed its own petition for declaratory order also requesting that the PUC resolve the boundary dispute.

By order of May 23, 1990, an administrative law judge (ALJ) directed that the petitions of Met–Ed and West Penn be consolidated for hearing and decision. By order of June 21, 1991, a second ALJ[3] granted, in part, the motion filed by West Penn requesting that Met–Ed be directed to provide notice of its petition to various entities. The ALJ requested that the Secretary of the Commission publish notice of the proceedings in the Pennsylvania Bulletin and the ALJ ordered Met–Ed to publish notice of the proceedings in a newspaper of general circulation.[4]

The ALJ ultimately issued a decision establishing the center lines of Route 234 and Newman Road as the boundary line with Met–Ed authorized to provide service east of the line and West Penn authorized to provide service west of the line. The decision also stated that both parties could continue to render service to customers on either side of the boundary line who were already receiving service. By order of April 2, 1993, the PUC adopted the decision of the ALJ. This appeal by West Penn followed.

■ This court's scope of review of an adjudication of the PUC is limited to determining whether any constitutional

3. This second ALJ is the one who ultimately issued a decision in the case.

4. Notice was also provided to the Office of Consumer Advocate and to Donald Kimple, owner of the Kimple residence.

rights were violated, whether an error of law was committed, or whether the findings of fact are supported by substantial evidence. *Glade Park East Home Owners Association v. Pennsylvania Public Utility Commission,* 156 Pa.Commonwealth Ct. 466, 628 A.2d 468 (1993).

West Penn first argues that the PUC erred in determining that Met–Ed and West Penn have overlapping service territories. West Penn appears to be arguing that because the policy of the PSC (and of the PUC today) was that electric utilities should not be permitted to compete in the same service area, the effect of the certificate of convenience granted to West Penn's predecessor in 1927 could not have been to create overlapping service territories, and the PSC must have intended to give the rights to the territory to West Penn.

West Penn does not cite any authority to support the idea that it was improper or illegal for the PSC to create an overlapping territory in 1927. Although the parties do not dispute that the policy of the PSC and the PUC was and is not to allow competition between electric utilities in the same service area, Met–Ed points out in its brief that there is a difference between not allowing competition and not allowing overlapping service areas. For example, the PSC could have intended to create an overlapping territory for the disputed territory in this case, which was a rural area in 1927, so that either company could serve new customers in the area if it so chose. Or the intent could have been to give the customers some choice in a situation where neither company had previously constructed facilities in the area. Then, over time, as the utilities extend service into the region the PSC (or PUC) could divide the territory and modify the certificates as it is doing in the present case.

We are not saying that this scenario is an accurate depiction of the intent of the PSC in 1927. We are merely pointing out that it is impossible for this court or the PUC to say, with this record, what the intent of the PSC was in granting the certificate of convenience to West Penn's predecessor in 1927. Furthermore, as Met–Ed points out, a certifi-

cate of public convenience can only be revoked for cause. *Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission*, 10 Pa.Commonwealth Ct. 533, 311 A.2d 370 (1973). Absent explicit evidence that the PSC intended to partially revoke, for cause, the certificate granted to Met–Ed's predecessor in 1916, the PUC did not err in declining to conclude that the PSC had such intent.[5]

In a related argument, West Penn states that the ALJ and the commission erred in not presuming that West Penn's predecessor gave notice of its application for a certificate of public convenience to Met–Ed's predecessor in 1927. This argument is based on a statement in the ALJ's decision that if West Penn wished to argue that the certification of West Penn's predecessor to serve part of Franklin Township acted as a partial revocation of the right of Met–Ed's predecessor to serve all of Franklin Township, West Penn must prove that Met–Ed's predecessor was given notice and an opportunity to participate in the proceeding.

Again, we hold that the PUC did not err in refusing to conclude that the PSC intended to partially revoke the certificate of Met–Ed's predecessor, absent explicit evidence of such intent. The question of whether Met–Ed's predecessor received notice and an opportunity to be heard in the 1927 proceeding is speculative absent such evidence. The PUC rejected this same argument by noting that the controlling factor for this issue is whether there is evidence that the certificate of Met–Ed's predecessor was revoked for cause. Without such evidence, any presumption as to notice of the 1927 proceeding is immaterial.

■ Lastly, West Penn argues that the notice of the current proceedings, which was published in the Pennsylvania Bulletin and a newspaper of general circulation, was inadequate and that the ALJ should have required Met–Ed to

5. In any event, were the PUC to conclude that the PSC intended to revoke in part the certificate granted to Met–Ed's predecessor, the PUC would nevertheless retain the power to modify the current service territories. West Penn does not argue that the PUC would somehow be bound by the action of the PSC in 1927.

provide individual notice to each of its sixty customers in the disputed territory. In support of this argument, West Penn cites the PUC's regulation at 52 Pa.Code § 5.42(b) regarding petitions for declaratory orders. That section reads:

A copy of the petition shall be served on the Office of Consumer Advocate, all persons directly affected and on other parties whom petitioner believes will be affected by the petition. The service shall be evidenced with a certificate of service filed with the petition.

Met–Ed argues that inasmuch as it sought only to establish a territorial boundary which would not affect its existing customers, there was no need to provide those customers with individual notice. We are inclined to agree. Met–Ed's petition states that both Met–Ed and West Penn are providing service in the western portion of Franklin Township and asks the PUC to draw a boundary line between the two. There is nothing in Met–Ed's petition to indicate that Met–Ed considered the question of whether it should be permitted to continue serving its existing customers to be at issue. On the other hand, *West Penn's* petition for declaratory order requested that the PUC order that all electric service in the disputed territory be turned over to West Penn and that Met–Ed be compelled to sell all of its distribution facilities in the disputed territory to West Penn. At the time of the motion for service West Penn had not yet filed its petition for declaratory order. However, West Penn filed its petition shortly thereafter and the two petitions were consolidated. It is unclear to this court why West Penn did not simply serve its own petition on Met–Ed's customers, especially as that petition clearly would affect those customers if the requested relief were granted. West Penn does not argue that it was denied access to any customer lists from Met–Ed. In any event, Met–Ed's customers were not directly affected by Met–Ed's petition. Therefore, Met–Ed was not required to provide individual notice to its customers under § 5.42(b).

While the ALJ, in deciding that individual notice was not required, recognized that Met–Ed was not seeking to change the status of any present customers, he analogized the case to

one where a utility applies for a change in the territorial scope of the utility's certificate of public convenience. The ALJ therefore decided that notice should be provided in accordance with 52 Pa.Code § 5.14 which governs such applications. This was the basis for his order that notice should appear in the Pennsylvania Bulletin and in a newspaper of general circulation. West Penn in its brief cites § 5.14(a) which reads:

An application to the Commission for authority under sections 1101, 1102, 2503 and 2505 of the act or as otherwise provided by the act, is subject to one or more of the following notice requirements as directed by the Secretary under § 1.51 (relating to instructions for service and notice):

(1) Publication in the *Pennsylvania Bulletin.*

(2) Publication in a newspaper of general circulation serving the geographical territory affected by the application.

(3) Actual notification to the parties affected by the application.

(4) Another form of actual or constructive notification as may be required by the Secretary.

West Penn argues that individual notice was required under § 5.14(a)(3).

There are two rather obvious obstacles with West Penn's argument regarding this section. The first is that the regulation states that an application is subject to "one or more" of the notice requirements. The applicant is not automatically compelled to provide all four forms of notice nor any one form. The second problem is that § 5.14(a) is not the section to which the ALJ was referring. The ALJ specifically referred to § 5.14(b) which is the section regarding applications for a change in service territory and which only requires notice in the Pennsylvania Bulletin and in a newspaper of general circulation. We need not even address whether Met–Ed's customers are "parties affected by the application."

The only other authority cited by West Penn in support of its argument that Met–Ed should have provided individual notice to its customers is *Barasch v. Pennsylvania Public*

*Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296 (1988). However, *Barasch* involved the PUC's approval of a contract for the purchase of electric power by West Penn from a small power production facility (QF). The contract would result in West Penn making payments to the other facility for future capacity costs in addition to energy costs and passing those costs on to its consumers. The court held that, because the contract would result in substantial increases in the bills of West Penn's customers unrelated to their current consumption, a substantial property interest was involved and due process therefore required that West Penn's customers receive notice of the proceedings.

The holding of *Barasch* is limited to the rather complicated facts of that case. The court made it clear in that opinion that its conclusion that there was a protectable property interest was based on the fact that the customers would be paying future capacity costs, as well as energy costs. This is evident from the following passages:

> [B]ecause of the length of the term of this contract and its legally enforceable guarantees of delivery of power, the contract provides for *capacity* payments as well as energy payments. Because West Penn will begin making capacity cost credit payments before the time when the capacity is actually needed, which West Penn projects to be in 1995, pass-through of these payments to West Penn's customers will result, at least in the near term, in substantial increases in their bills unrelated to their current consumption of power—a substantial property interest.

*Id.* at 100, 546 A.2d at 1305 (emphasis in original).

> [D]ue process requires that, before the PUC may issue a declaration approving the legality of the terms and conditions of a contract for a utility's purchase of power from a QF that includes payments for capacity, the utility's customers must be provided with notice of the proceedings and an opportunity to be heard to challenge the proposed action.

*Id.* at 104, 546 A.2d at 1306. The limited nature of our holding in *Barasch* is evident from our decision in *Consumer Edu-*

*cation and Protective Association International, Inc. v. Philadelphia Water Department Commissioner,* 133 Pa.Commonwealth Ct. 148, 575 A.2d 160 (1990), where we held that ratepayers do not have a property interest in rates and ratemaking. In that case we distinguished *Barasch* because of its unique facts and because it did not involve a general rate increase.

Because of its limited holding and because it concerned a rate increase due to the purchase of power from a small production facility, we fail to see how *Barasch* is relevant to the present case. For this reason and for the other reasons outlined above, we hold that the ALJ did not err in not requiring Met–Ed to provide individual notice of the proceedings to its customers in the disputed territory.

Accordingly, we will affirm the order of the PUC.

## ORDER

NOW, this 16th day of March, 1994, the order of the Pennsylvania Public Utility Commission, dated April 2, 1993, at Nos. P–00900429, P–00900429C001, and P–00900447, is affirmed.